## 13499.   ATLANTA GAS LIGHT COMPANY *v.* SAMS.

1. A company which does not install the gaspipes of a customer and has no duty of inspection or control over them is not responsible for their proper maintenance or condition so as to render it liable for injuries caused by a leak of which it has no knowledge. Thus, where a landlord in such a case applies for gas, and a workman of the gas company reports to him for the purpose of making the connection, it is incumbent upon the landlord to protect his own interest and that of his tenants by by seeing that such pipes are in proper and safe condition; and under such circumstances the company would not be liable to the landlord·or to his tenants on account of its failure to inspect the pipes upon the premises, unless at the time the gas was turned on the workman either knew, or in the proper performance of his own particular work should have become aware, of circumstances reasonably indicating the existence of such defects and dangers. The rule is similar where a tenant applies for gas. It is his duty to protect his own interest and that of those occupying the premises under his control by seeing that the pipes within such premises are in a safe and proper condition. Where the application is made by a tenant, it is, however, the duty of the company, upon making the connection, to exercise all reasonable and proper diligence for the protection of other tenants who have not applied for gas, by inspecting all pipes through which the gas upon being turned on might escape into other apartments of such independent tenants, or into the rooms of the same apartment, when the company actually knows or has reasonable grounds to suspect, the existence of rooms which are not in the custody or under the control of the tenant dealt with. *Christo* v. *Macon Gas Co.,* 18 *Ga. App.* 454 (89 S. E. 532); 12 R. C. L. 909 (§ 49); Schmeer *v.* Gas Light Co., 147 N. Y. 529 (42 N. E. 202, 30 L. R. A. 653); Greed *v.* Mfrs. Light &c. Co., 238 Pa. 248 (86 Atl. 95); Skogland *v.* St. Paul Gas Light Co., 89 Minn. 1 (93 N. W. 668).

2. In a suit against a gas company for damages growing out of an alleged homicide on account of escaping gas, where the petition shows that the deceased, under an arrangement with the landlord, continued to hold and

occupy one room of a specified apartment in a certain building, and that the prospective tenant of the other portions of the apartment had applied for gas, and that the defendant in connecting the gas in response to such request was negligent, (1) in that the defendant, upon turning on the gas, failed to inspect the condition of the pipes and outlets in the room thus held and occupied by the decedent, and (2) in not inspecting the meter after the connection had been made, so as to ascertain whether or not gas was escaping into any of the rooms served by it, and where there was evidence such as could authorize a finding in favor of the plaintiff upon each of these contentions, a verdict and judgment in favor of the plaintiff cannot be set aside because it appears from the evidence that the application for gas was in fact signed by the landlord, and not by such prospective contiguous tenant, where it also appears that the application of the landlord (who did not in fact designate herself as such) was received on condition that, if accepted, it was subject to indefinite delay as to when the work should be performed, and where it indisputably appears that the company's workman, in subsequently responding to such request, did not undertake to report to or in any wise consult, or even to see, the landlord, but in the execution of the work, including turning on the gas, dealt exclusively with the prospective tenant of the other portions of the apartment for which gas was desired. Under such circumstances the fact that the application was made by the landlord would not relieve the company of its duty to exercise all reasonable and proper diligence in inspecting all pipes in the building leading to apartments other than those of the tenant thus dealt with, and to other portions of the same apartment which the defendant knew or had reasonable ground to suspect were outside of the tenant's custody and control. This duty it could not delegate to the tenant with whom it thus actually dealt.

3. The trial judge, who, at the request of the defendant, charged the jury on the law governing where a request for gas is made by the landlord, as well as when made by the tenant, did not err in qualifying the charge so as to permit the jury to consider the special circumstances and conditions dealt with in the preceding division of the syllabus.

4. The mere voluntary writing off of a part of the verdict by the plaintiff is not in itself a ground for reversal, where it does not appear that this was done on the suggestion of the presiding judge, or that his refusal of a new trial was influenced by the reduction of the verdict; nor can a new trial be granted on account of the size of the original verdict, unless the amount as found by the jury is so excessive as to lead the court to suspect bias or prejudice on their part. *Seaboard Air-Line Ry.* v. *Randolph*, 129 *Ga.* 796, 798 (59 S. E. 1110). The bill of exceptions states as follows: " Defendant's said motion for a new trial and the amendment thereto came on for hearing before the Honorable W. D. Ellis, Judge, on December 27, 1921, when said motion and the amendment thereto, the recitals of fact therein being approved, were argued to the court and submitted for the court's consideration. Thereafter, on February ,17, 1922, the plaintiff, through her attorneys of record, wrote off $5,000 from the verdict and judgment in favor of the plaintiff, thereby leaving the said verdict and judgment to stand

for $10,000. Thereupon, on February 17, 1922, the court ordered that defendant's motion for a new trial be overruled upon each and every ground contained in the original and amended motion for a new trial, and a new trial was denied." The use of the word "Thereupon" renders the sentence in which it is employed somewhat ambiguous, for the reason that the word carries either the meaning " following upon, or in consequence of." Standard Dictionary. Since, however, one of the ordinary uses of the word is to mark the succession of events in time, and since the pleading of the party alleging error, as contained in the bill of exceptions, is to be construed more strongly against him, it cannot be held, as a matter of law, that the trial judge, in refusing the new trial, was influenced by the action of the plaintiff in writing off a portion of the verdict.

5. The grounds of the motion for a new trial not controlled by the foregoing rulings and dealing with portions of the court's charge, with exceptions taken to his failure to charge, with his action in permitting a witness to testify who had already testified by interrogatories, where sequestration of the witnesses had been asked for, and with exceptions taken to the admission and to the exclusion of evidence, have been carefully considered; and for none of the reasons assigned does this court feel authorized to reverse the judgment of the court below in refusing to grant a new trial.

DECIDED FEBRUARY 8, 1923.

Damages; from Fulton superior court — Judge Ellis. February 17, 1922.

Application for certiorari was denied by the Supreme Court.

The plaintiff and her family lived in Canton, Georgia, in the year 1918. The family consisted of herself, her husband, the deceased boy, who was the oldest child, two other boys, and a girl, aged respectively 13, 11, and 9. The husband worked as a bookkeeper in a store in Canton for $75 a month. Before leaving Canton in February, 1918, the deceased boy was working there at a salary of $30 a month. When he came to Atlanta, Georgia, he was employed at $60 a month by the Southern Express Company, and at the time of his death, November 2, 1918, when he was 16 years old, he was earning $75 a month with the same company, working at night between the hours of 7 p. m. and 7 a. m. He was then renting a room in Apartment No. 4 at 11 Crew street in Atlanta, and was boarding near by at Mrs. O. P. Black's, 172 East Fair street. The building at No. 11 Crew street was owned by Mrs. M. L. Isham, who lived with her daughter Mrs. Graham on the ground floor in Apartment No. 2. This building was a two-story apartment house, having two apartments on each floor, of about six rooms each. The apartments were numbered 1,

2, 3, 4. No. 1 was on the north side, downstairs, and No. 3 was directly above it, while No. 2 was on the south side downstairs, with No. 4 directly above it. Mrs. Hall was the sister of Mrs. Isham, and lived in apartment No. 3, but had arranged to move across the hall from apartment No. 3 to apartment No. 4. Douglas Sams, the deceased, was at that time occupying one room in apartment No. 4, together with a young man named Walter Cochran, and it was arranged that, after the moving of Mrs. Hall to apartment No. 4, Sams and his room-mate would move to another room in the building. In the basement under the back porch of the building provision was made for separate gas-meters, with a view to furnishing gas to each of the four apartments in the building, but on October 31, 1918, there was no meter installed for apartment No. 4, and for some little time there had been no meter for that apartment. In view of Mrs. Hall's proposed move into apartment No. 4 on November 1, Mrs. Isham, the owner of the building, on October 31, 1918, made written application to the defendant for gas, to be supplied by a meter located on the premises at No. 11 Crew street for apartment No. 4. Mrs. Isham explained that she made the application instead of Mrs. Hall to avoid making a deposit, which she understood would not be required of her as owner of the premises. The application failed to indicate whether Mrs. Isham was landlord or tenant. It provided that, if accepted, it was to be taken " with the understanding that connection is subject to indefinite delay."

Pursuant to the written application, the gas company sent Bagwell to the premises early in the morning of November 2, 1918, which was Saturday, for the purpose of installing a meter for apartment No. 4. Mrs. Isham testified, and it does not appear to have been in any wise contradicted, that she did not have any communication with Mr. Bagwell, and did not see him. Mrs. Hall testified: that, early on the morning of November 2, the gas-man arrived at apartment No. 4 between the hours of 7 and 8 o'clock. She had to get her family off to work at 8, and she was impressed with his coming by reason of the time being inconvenient to her. She first noticed the gas wagon in front of the house when she went downstairs to Mrs. Isham's apartment to prepare her breakfast. After she had prepared her breakfast and gone upstairs, and when getting her folks off, she noticed that the

29

stove in apartment No. 4 was connected, and the gas-man was apparently working around the stove. She saw him in her kitchen in that apartment, and she supposed she said something to him, but did not remember what it was, nor did she remember anything the gas man said to her. After she came upstairs with the breakfast he did not stay very long, but went back downstairs, at which time the gas was on and the stove would burn. The room in which Douglas Sams was subsequently found dead was next to the room in which the stove was located. Mrs. Hall knew that a boy roomed there, but she did not see him come in that morning. She knew he slept during the day, but she did not know when he came in. She began to notice the smell of gas about 10 o'clock, but nothing was done about it. Mrs. Butterworth, who lived downstairs in apartment No. 1, was up to see her between 10 and 11 o'clock, and remarked on the smell of gas. Testimony of Mrs. Butterworth and Mrs. Graham showed substantially that young Sams generally came back from work between 7:30 and 8 o'clock in the morning, and sometimes stopped by Mrs. Butterworth's for the mail, and from there went to his room to sleep during the day. The room was small and had a double bed in it and one window, which had a dark green shade and was generally kept closed, with the shade pulled down. There were two doors to the room, one leading into the hall, which was the door commonly used, and this door was locked from the inside by the boys, and was found thus locked on the day of young Sams' death. The other door was a swinging door, which opened into the kitchen where the stove was located, and this swinging door was fastened or hooked from the inside of Sams' room. There was a gas-fixture in the center of the ceiling, of the ordinary goose-neck type, on which there was an electric bulb. The key to the gas-fixture and the key to the electric-light bulb were from three to six inches apart. This fixture was over the side of the bed.

About 4 o'clock in the afternoon of Saturday, November 2, the smell of gas became so pronounced throughout the apartment building that Mrs. Hall sent to Mrs. Butterworth, who came up and broke into Sams' room, and found the gas escaping with a sizzling sound from the fixture, and Sams in his nightclothes, in bed, dead. Nobody saw Sams enter his room that day. He was

there alone, his room-mate having gone to Canton the afternoon before. He left his work at the Terminal Station at 7 o'clock that morning, and walked from there to his boarding-house at the corner of Crew and Fair streets, a distance of several blocks, where he ate his breakfast, and he went from the boarding-house to the apartment, being last seen alive by the maid who waited on the table at Mrs. Black's. There was testimony for the plaintiff that Sams was a healthy, normal young man, 16 years of age and apparently in good spirits. He went home to Canton frequently on Sundays, where his mother testified he would frequently give her small sums of money ranging from $1 to $5, and sometimes bring his little sister presents in the way of clothes, etc. The plaintiff introduced also two witnesses who purported to be experts in installing a gas-meter in a house. The first of these witnesses — Daniel — testified, in substance, that after the meter was bolted to the inlet and the outlet pipes and the stop-cock on the inlet pipe turned on, allowing gas to flow into the meter, one could tell whether everything in the system of pipes, etc., was gas-tight, by watching the dial or register on the meter, on which dial there was one hand which was especially sensitive, and would show the passage through the meter of the smallest amount of gas; and that if that hand did not move, it meant that no gas was escaping anywhere beyond the meter; and it would take about 2 or 3 minutes to discover whether there was any leak, by watching this sensitive hand. The other alleged expert — Stewart — testified that he worked for the defendant 22 or 23 years ago, and since that time had been in the plumbing business. He testified, in substance, that, in addition to watching the dial or register on the meter, he would examine all openings and see that they were plugged up, or the fixtures were in first-class condition, and that the tips were in the burners, and if all these matters were found to be in proper shape, he would turn the gas on and leave it on; if not, he would turn it off. He further testified that, if he found one room locked and he did not know there was a gas-jet in that room, he would shut the gas off if he could not get into the room, because he would not be sure that gas was not escaping in that room. Both experts agreed that the gas company did not have anything to do with repairing pipes in a house, that this was the owner's business; and that the gas company did not have anything

to do with the condition of the chandeliers or fixtures; that these are the property of the owner, and it is his business to look after them, the gas company's proper and direct responsibility for maintenance and condition ending with the meter.

For the defendant the witness Bagwell testified, substantially, that he reported at the shop on Decatur street at 7 o'clock, getting his materials and wagon together. He arrived at No. 11 Crew street at about 7:30, and completed his work there in about 30 minutes, during which time he installed the meter for apartment No. 4. He stated that he was familiar with the location of the meters, and that he went directly to that location, left the new meter there, and then went upstairs, and inquired at apartment No. 4 if that was the apartment applying for gas. Mrs. Hall met him at the back door and assured him that she was glad to see him there, that she was anxious to get the gas turned on. Accordingly he returned to the basement, connected up the meter to the inlet and outlet pipes, turned the gas into the meter, and with his watch and a flashlight observed the sensitive hand on the dial of the meter for five minutes, during which time the hand did not move, thereby indicating to him that no gas was flowing through the meter. Thereupon he went upstairs and examined the stove, letting some air out of the pipes, adjusting some valves on the stove, and saw that it was in proper operating condition. He then examined the fixtures in all the rooms except one, letting air out of them, and saw that they were all in proper operating condition, and then he tried the door into Sams' room, and found it locked. Not being able to gain entrance into this room, he spoke to Mrs. Hall about it, and she said that some one else occupied that room and she had no key for it, and that, if there was a fixture in there, she would look after it herself when the man came in. Bagwell further testified that he did not know at that time that there was anybody in that room asleep, or that there was anybody at all there. After this conversation with Mrs. Hall he directed her not to light the burners on the stove until he went back to the meter again, and he went back and watched the meter a second time about five minutes, and the hands did not move. After this second test he told Mrs. Hall that the gas was ready for use. Testimony for the defendant further showed that the meter for apartment

No. 4 was again inspected a few days after the homicide, and found to be in proper working condition. There were no other employees of the company with Bagwell during the installation of the meter. It appeared that he had lived in Atlanta about fifteen years, and had been working for the company for fourteen years, first as a helper and then as a gas-fitter. Bagwell's testimony was corroborated by the written reports in the records of the gas company, showing the installation of the meter as testified.

In rebuttal the plaintiff introduced Pierpont Graham, a boy 15 years old at the time of the trial and about 13 at the time of the homicide, who sought to discredit the testimony of the witness Bagwell by stating that he showed Bagwell where the meters were located and watched him install the meter, and heard him say, after he had put in the meter, that there must be a leak somewhere. After Bagwell made this remark he went upstairs and inspected the stove, and after looking over the stove, as the witness remembered, Bagwell stated there was not anything wrong there, and went back down and looked at the meter and left. He did not see Bagwell try to get into Sams' room, or into any room, where the door was locked, and did not see him examine any fixtures. Mrs. Hall, who had previously testified by depositions, was sent for, and she testified, that she did not remember anything that occurred between her and Bagwell in regard to Sams' room, and that she did not tell the gas-man that she did not think there was any fixture in that room, for she knew there was; that she did not tell him that the room was locked and she would take care of the fixtures in that room and look after it when the man came in. She admitted testifying in chief that she did not remember what was said between her and the gas-man when he was in the kitchen.

*Smith, Hammond & Smith, Colquitt & Conyers,* for plaintiff in error.

*Reuben R. & Lowry Arnold, A. H. Davis,* contra.

JENKINS, P. J. (After stating the foregoing facts.) In support of the doctrine announced in division 2 of the syllabus, wherein it is held that the company is not relieved from all duty owing to tenants other than such as the agent of the company reports to, by reason of the fact that the application for gas had been in fact signed by the landlord, when it further appears that, under the

circumstances set forth in the syllabus, the agent and employee of the company in no wise notifies or reports to the landlord, we desire to quote a portion of what was said in the opinion in the case of Skogland *v.* St. Paul Gas Light Co., 89 Minn. 1 (93 N. W. 668), cited in the syllabus: "If, when summoned, respondent's representative had gone to the house, and merely stated to the landlady that he had come to make repairs, without telling her the gas would be turned off, then, under such circumstances, it may be conceded the company would be liable for damages; but, if he notified the person in charge of the house that the gas would be turned off, in our opinion respondent did all that could be reasonably required, and, if Mrs. Lapham failed to properly notify her boarders, or to personally turn out all the lights in the various rooms, then the responsibility cannot be placed on the gas company. It would be an unreasonable demand to require the company to go through the house and look at each jet to see that it was properly turned off, or to notify all the occupants to that effect. The landlady was the representative of the members of her household, and it was with her that the company transacted its business. It was called by her to correct the fault, and she would naturally be the person to notify it what was to be done. It is claimed that the evidence is not conclusive as to the fact of her being informed the gas would be turned off, but it seems to us there can be no dispute on that point, for, while the evidence does not disclose that she was notified in express words, it does show that she came in response to the call for her, and, as the result of her conversation with the company's employee, immediately went through the house, and, with the assistance of one of the boarders, turned off the gas, from which it appears she understood that it would be turned off in the basement, and that she had been so notified by the workman."

*Judgment affirmed. Stephens and Bell, JJ., concur.*