# Standard Elkhorn Coal Company v. Davis.

(Decided January 31, 1928.)

## Appeal from Floyd Circuit Court.

1.  Gas.—Where plaintiff left gas stove burning in her residence and during night gas supply was cut off and in the morning pressure was restored and plaintiff became ill from gas fumes, held question of contributory negligence in leaving fire burning in stove while she was asleep held for jury.

2.  Appeal and Error.—In action against a coal company for injury and pressure was restored in the morning, finding of jury that plaintiff was not negligent in leaving fire burning in gas stove while she was asleep is conclusive.

3.  Master and Servant.—In action against coal company for personal injuries from gas fumes when supply of gas was cut off, extinguishing fire in plaintiff's stove, and pressure was restored before she arose in the morning, mechanic who adjusted gas regulator at 6 o'clock a. m. acted within scope of employment, although ordinarily he reported for duty at 6:30 a. m., where evidence showed that he had entire control over regulator.

4.  Gas.—Where coal company which furnished gas to its employees had knowledge of practice of users of the gas increasing or diminishing flow thereof by manipulation of a lever of the regulator which controlled the flow, it was negligent in leaving the regulator without protection or safeguard.

5.  Gas.—Where the regulator which controlled the flow of gas in plaintiff's residence was unguarded and uninclosed, and any one from gas fumes when fire in gas stove went out during the night could regulate flow of gas by manipulation of a lever, in action for personal injuries from escaping gas, where there was nothing to indicate a willful or wanton act of a trespasser in throwing on the regulator, court did not err in failure to instruct as to defendant's nonliability therefor.

6.  Damages.—In action for personal injuries from inhaling gas, evidence that plaintiff was a healthy person before inhaling gas and became a chronic invalid for more than two years thereafter, coupled with medical opinion that her present condition could have been caused by inhalation, held to show injuries to be proximate result of inhalation.

7.  Damages.—$5,000 damages for bodily injuries resulting from inhalation of gas held not excessive, where evidence showed plaintiff had become chronic invalid for more than two years from time of injury.

COMBS & COMBS for appellant.

J. C. HOPKINS and JAMES & HOBSON for appellee.

Opinion of the Court by Judge McCandless— Affirming.

Mrs. Catherine Davis sued the Standard Elkhorn Coal Company for personal injuries alleged to have been occasioned by the negligence of that company, and recovered judgment for $5,000. The coal company appeals, and raises a number of questions, a reference to which will later be made.

The facts are these: The coal company furnished residences and fuel gas to its employees, for which they paid a specific rental. Mrs. Davis' husband was an employee of the company, and they occupied one of its houses. On the night of the 5th of November, 1925, they retired, leaving their gas stove burning. Some time during the night the supply of gas was cut off, extinguishing the fire. Mr. Davis, according to custom, arose early in the morning, and, without noticing the absence of gas, went to work, returning to his breakfast at 8 o'clock. In the meantime the gas pressure was restored, and, there being no fire in the Davis stove, the gas was forced through the open burner into the bedroom. Mrs. Davis awoke some time after this. She was then almost overcome by the gas fumes, but was able to get up and raise the windows and turn off the gas. She became violently ill, and has since suffered in many ways, her physician expressing the opinion that she is now affected with bladder and kidney trouble; and she claiming to be a physical wreck and attributing all of her ailments to the inhalation of the gas fumes.

The company received the gas under high pressure, but controlled the flow to its customers by a regulator located on a vacant lot some 10 feet from the sidewalk, and the negligence relied on is that the company left this regulator unguarded; that some one inadvertently cut off the pressure during the night, thereby extinguishing plaintiff's fire, and, upon the pressure being restored, the gas was caused to enter her room, producing the result stated supra. As to these matters, the company's mechanic Tom Cain testifies:

"Q. Did you have in your charge the gas line and regulators that the company operated there? A. I did. Q. What did you do to those regulators and gas lines used there in Garrett for their employees? A. I repaired all the pipe lines, put in

the regulators, installed them, and looked after them. Q. Did you look after the regulators on the gas line at the time plaintiff, Catherine Davis, was injured? A. Yes, sir; still worked at the same thing."

And, after explaining the general location of the regulator, continues:

"Q. How near the sidewalk was it located? A. I should say maybe 10 to 12 feet, between 8 and 12 feet. Q. Was this regulator protected or covered, or was it in the open. A. It was in the open. Q. Anything around it or house over it? A. Well there was a fence on the street side; there was no house on it. Q. Any fence around the regulator? A. No. Q. What was the condition of that regulator on this morning, the morning of the injury? A. Well some of the people who lived across there came out and told me the gas was off, could not get breakfast, and asked me to go out and put it on. I went out, and there was a 2x4 lying across the lever and the lever tripped out. Q. Would that shut off the gas? A. Yes. Q. What did you do? A. I raised the lever and put it back on. Q. Did that regulate the gas so as to put the gas back into the house that plaintiff, Davis, was living in? A. Yes; it would turn it into all of them. Q. Did you notify the plaintiff, Catherine Davis, that you were going to turn the gas back into her house? A. No. Q. Describe to the jury the regulator and the pipe line leading from the regulator into the house containing the gas? A. Well this was a low-pressure regulator that took gas at 35 pounds' pressure, and it was reduced down to the pressure you wanted to let into the house, and I always had the regulator set for 8 ounces, from 6 to 8 ounces, and at times it would seem that they want more gas than that when they would all be pulling at once, and it would not be letting enough through at that pressure, and some of them would let that lever out and put more pressure on it. If you put more weight on it, that lets more pressure through. Q. Was it so situated that any one could get to it and tamper with it and let the gas off and on? A. Yes."

It is urged that Mrs. Davis was guilty of contributory negligence in leaving the fire burning in the stove while she was asleep. She states, however, that they had lived in that community but a short time and were not familiar with the use of gas and was unaware of any danger of a stoppage and recurring pressure of this gas, so it cannot be said that she was guilty of contributory negligence as a matter of law, even if such conduct is to be regarded as negligence, and, as that issue was properly submitted to the jury, its finding is conclusive on that point.

It is next claimed that the mechanic, Tom Cain, was not on duty at the time he removed the timber from the regulator, and his act in so doing was not the act of appellant. Cain testifies that he went on duty ordinarily at 6:30 a. m., and that the regulator was adjusted that morning before 6 o'clock, but the evidence establishes the fact that he had entire control over the gas regulator and mains at all times; hence he was within the scope of his employment at the time he made this adjustment.

The next insistence is that the timber was purposely thrown on the regulator, and that this was a willful act of some trespasser for which appellant was not liable. In this respect it is conclusively established by the proof that, while there was a fence between the regulator and the street, otherwise it was unguarded and uninclosed, and that any one could increase or diminish the flow of gas by a manipulation of the lever. Cain testifies that the users of the gas were accustomed to doing this, and the fact that a scantling had been laid across the lever indicates very strongly that some one had attempted to thus increase the pressure, and in so doing had tripped the lever and cut off the supply. Clearly with the knowledge of this practice it was negligence upon the part of the company to leave the regulator controlling the flow of this dangerous agency without any protection or safeguard. Louisville Gas Co. v. Guelat, 150 Ky. 583, 150 S. W. 656, 42 L. R. A. (N. S.) 703; Triple-State Gas Co. v. Wellman, 114 Ky. 79, 70 S. W. 49, 24 Ky. Law Rep. 851, 1 Ann. Cas. 64; U. S. Natural Gas Co. v. Hicks, 134 Ky. 12, 119 S. W. 166, 23 L. R. A. (N. S.) 249, 135 Am. St. Rep. 407; Louisville Gas Co. v. Gutenkuntz, 82 Ky. 432. True, in Watson v. Ky. & Indiana Bridge Co., 137 Ky. 619, 126 S. W. 146, 129 S. W. 341, where one Duerr had thrown an ignited match into a pool of gasoline

which the company had negligently permitted to remain upon the street without a guard, and which caused an explosion, the court held that, if Duerr's act was willful and malicious, the company was not liable, though, if his act was unintentional and inadvertent, the company would be liable, and in that case there was evidence in support of both theories that warranted an instruction as to each. But here, while the evidence as to the removal of the lever on the occasion of the injury is purely circumstantial, there is nothing to indicate a willful or wanton act. And it follows that the court did not err in failing to instruct as to it.

It is next urged that plaintiff's injuries are not shown to have been the proximate result of the inhalation of the poisonous gas. In this respect Dr. Reddish, an eminent physician, testifies as to appellant's general condition when he examined her some months after the injury and on several subsequent occasions, saying that she seemed to be suffering from an intoxicated condition particularly of the kidneys, bladder, and legs, and that "it might have been the result of gas poisoning . . . an indication following the inhalation of gas might have produced kidney lesion or bladder irritation that proceeded for that length of time." Being asked how probable that was, he said, "I mean I don't know, I have not seen, no one sees, enough of gas poisoning; . . . I mean that cases of gas poisoning are so often successful that there are only acute cases of gas poisoning; it doesn't occur often enough to give you a basis upon which to judge. . . . " After describing her symptoms, the doctor is not positive that such condition was or was not caused by gas poisoning on account of the meagerness of such practice, but he does think it possible. The company's physician testifies that he had waited on Mrs. Davis before the injury, and that she was suffering from kidney trouble. This is vehemently denied by her. So taking the plaintiff's evidence as true, we have a normal, strong, and healthy person before inhaling the gas and one who has become a chronic invalid for more than two years since that time, without any other cause being shown therefor, coupled with the medical opinion that her present condition could have been caused by such inhalation. We think this sufficient evidence upon which to base a verdict, even though the physicians are not positive as to the producing cause.

The instruction as to negligence was restricted to the duty of defendant to use ordinary care in having and maintaining the regulator, gas pipe fixtures, and appliances in such condition as to prevent the escape of gas into appellee's house, and in this respect is not criticised. Also, if plaintiff's evidence as to her injuries is true, it cannot be said that the verdict is excessive.

Wherefore, perceiving no error, the judgment is affirmed.