WILLIAM EBERLE v.
THE CONNECTICUT LIGHT AND POWER COMPANY ET AL.

SUPERIOR COURT      NEW HAVEN COUNTY      FILE No. 14691
AT WATERBURY

Memorandum filed July 14, 1947.

*Hugh J. McGill,* of Waterbury, for the Plaintiff.

*Halloran, Sage & Phelon,* of Hartford, *William F. Healey,* of Derby, *Carmody, Larkin & Torrance,* of Waterbury, for the Defendants.

CORNELL, J. On or about June 9, 1941, the Federal Works Administration, in the exercise of powers conferred upon it by act of Congress contracted with defendant, John H. Eisele Company, Incorporated (hereinafter referred to as the "general contractor") for the erection of three hundred housing units on Hamilton Avenue and vicinity in Waterbury in this state. The work was "Project Number Conn. 6041." Included among these structures was one having six apartments, one of which apartments was designated 158 Proctor Street. The plumbing work and, of pertinency here, the gas piping within the units, was done by William L. Harmonay Company, also a corporation of the state of New York (hereinafter identified as the "sub-contractor") under a subcontract with the general contractor. The gas supply to this, as well as to all the units was furnished by defendant, Connecticut Light & Power Co., a public utility corporation of the state of Connecticut, hereinafter referred to as the "utility."

Only persons employed in factories engaged in defense work, and their families, were eligible to rent the several apartments contained in the project. As the work proceeded and apartments were made available, they were rented as speedily as possible. In this respect, the practice was: As a unit neared completion, the project manager notified the development manager of that fact, whereupon the latter forwarded notices to eligible persons awaiting housing facilities that they might inspect and apply to rent, apartments in the same. On February 6, 1942, the Public Building Administration (the construction agency) and the Division of Defense Housing (the management agency)

entered into a written agreement whereby the former represented that the unit which included the apartment known as 158 Proctor Street would be ready for use and occupancy on February 11, 1942 and the latter agreed to accept the same as of that date. Attached to this document was a list of various defects and omissions in the work certified by the project engineer (who was a representative of the United States government) among which was "1. Test and correct all mechanical equipment, gas, water lines, air ducts, electric wiring and fixtures." The general contractor did not execute the document on February 6, 1942 but did so shortly after that date and before February 11, 1942, and also with the project engineer and the housing manager signed a certification to the effect that: ". . . this acceptance does not relieve the contractor of fulfillment of any of the obligations to the contract." Such a notice had been given to the development manager on February 2, 1942 and the latter at once advised eligible persons that the unit in question would be available for inspection as rentals on February 6, 1942.

Plaintiff, among about forty, responded and after inspecting several of the units, applied for the apartment known as 158 Proctor Street. On February 6, 1942, a lease was executed between Federal Works Agency and plaintiff, dated as of that day, but to commence on March 1, 1942 and terminate on the last day of that month. It also provided that: "The tenant shall have the right to occupy the premises during the period from February 18, 1942 to the commencement of the term hereof" at the same rental as fixed for March, prorated. It was in contemplation of the parties, that the rental would thereafter continue on a month to month basis commencing wth the first day of each month. Plaintiff paid at that time the equivalent of the rental charge prorated for March, and that for the period, February 18 to February 28, together with utility services which were included in the rental charge. When plaintiff executed the lease he supposed that all fixtures were connected, that the apartment was in tenantable condition and that water, gas and electricity were in supply. Of these, however only electricity had been then connected into the house.

At the time that the lease was executed plaintiff informed the project manager that his furniture was in Pennslyvania and would not be delivered to the house until the following Tuesday, which was February 10. He requested and the manager granted him permission to move a cot into the apartment

and to stay there until his family arrived and household necessities were delivered. It was the practice of the housing manager, in any event, to insist that persons leasing any of the apartments light and maintain a fire in the furnace in same one or two days before taking occupancy after the water was made available to insure against the pipes freezing.

On Saturday afternoon, February 7, 1942, about 5 p. m. plaintiff caused the cot to be delivered and placed in the kitchen and he slept there that night. Electricity was available for lighting, although there was a shortage of bulbs, and he was under the impression that water and gas were, also. However, on attemptnig to use the bathroom on the next morning he discovered that the fixtures there were not connected. Plaintiff worked on the following day, (Sunday, February 8) and enroute to his return to the apartment, about 5 p. m. stopped at the project office to inform the maintenance manager of that fact and that, apparently, no gas was available.

The gas supply for the house came from a main in the street laid by the defendant utility company. From this a pipe was run into a subcellar under the house and thence another to the utility room in the apartment. Three cocks controlled the flow of gas up to and including the last named point, viz., a curb cock in the street, a governor cock in the subcellar and a pet cock in the utility room which latter adjoins the kitchen and living room on the first floor and in which there was also situated a hot-air furnace, a coal bin and hot water tank. From the pet cock in the utility room one pipe connects with the hot water heater there; another runs down into the subcellar, continues horizontally for a short distance and then turns up, vertically, underneath the kitchen and after passing through the kitchen floor is connected to the gas stove in that room, supplying fuel to it. It is found that the defendant's general contractor's subcontractor, which firm installed that part of the gas piping, neglected to affix a drip plug to the pipe at the point where it proceeds vertically upward from the horizontal section, to connect with the gas stove, leaving there an opening of about three-quarters of an inch through which, upon the opening of the pet cock in the utility room and the consequent admission of it to that portion of the line gas would escape.

Upon plaintiff's complaint the maintenance manager came to plaintiff's apartment and following the failure of an andeavor to

light the gas stove, went to the utility room to examine the position of the gas pet cock. At that time the curb cock and governor were open and the pet cock was closed so that while gas from the street main was admitted to the point where the pet cock was, it could not flow beyond that point unless the pet cock was opened wholly or partially. Applying a wrench to the pet cock the maintenance manager opened it to allow a full flow of gas to the kitchen stove, and then tried to light a burner therein. Not succeeding, he permitted the pet cock to remain open for a short time for the purpose of "bleeding the line." After trying again to light the stove and not succeeding, he returned to the utility room with the intention of turning the pet cock to its closed position and applying his wrench for that purpose to all appearances had done so before leaving the premises. It is found, however, that he did not fully turn off the pet cock. As a result of this, gas continued to pass through the piping and escaped through the opening where the drip leg should have been placed, into the sub-cellar and slowly and in relatively small quantity penetrated into the kitchen above.

The maintenance manager left plaintiff's apartment about 6:15 p. m. and plaintiff, with all windows and doors closed (except possibly one or both of those leading to the utility room) retired for the night about one-half hour later, sleeping on the cot he had placed in the kitchen. He was found the next morning (Monday, February 9) shortly after ten o'clock, unconscious from asphyxiation and removed to a hospital.

Plaintiff, during the trial, withdrew his claim against the United States Housing Authority and dropped it as a party defendant. As respects the subcontractor who did the plumbing and piping, as already noted this was a New York corporation, Michael Harmonay Corporation, organized under the laws of the state of New York, of which the named defendant, William L. Harmonay is president and treasurer. Michael Harmonay whose name the corporate title bears is defendant William Harmonay's father. Plaintiff did not name this corporation as defendant, but apparently, through misinformation alleged that William L. Harmonay of Yonkers, in the state of New York was such contractor. There is no claim that the corporation is a family corporation such as occurred in *Kornblau* v. *McDermant*, 90 Conn. 624, 635. Under the circumstances the corporation must be treated as an entity distinct from the named individual defendant as in *Eames* v. *Mayo*, 93 Conn.

479. No judgment may enter against defendant, William L. Harmonay under the conditions and as the real plumbing sub-contractor was not made a party defendant, obviously none may be granted against it.

As respects the principal contractor, aside from situations in which peculiar circumstances exist such as where the contract between him and the owner imposes joint liability on the con-tractor and the subcontractor or where the duty assumed by the contractor is nondelegable (neither of which conditions exist in the instant case) the principal contractor may not be held liable for the torts of a subcontractor committed during the performance of the work, barring, of course, concurring negligence on the part of the principal contractor. *Carey* v. *Baxter,* 201 Mass. 522, 526; 18 A. L. R. 810, § 5; 38 A. L. R. 407, § 2. It is found that any negligence of which the sub-contractor was guilty in failing to affix a drip leg to the gas line at the point above mentioned is not imputable to the prin-cipal contractor under the circumstances obtaining here.

The principal contractor would, of course, be liable for any negligence on his own part whereby another is injured. And there are authorities holding that such liability extends to third persons coming upon the premises at the instance of the owner of same during the progress of the work. *Kimber* v. *Gaslight and Coke Co.,* (1918) 1 K. B. 439, 9 B. R. C. 674 C. A.; *Charles A. Cowen & Co.* v. *Price,* 121 C. C. A. 618, 203 F. 473; *Brentlinger* v. *Louisville R. Co.* 156 Ky. 685; *Coolidge* v. *New York,* 99 App. Div. (N .Y.) 175, Aff'd 185 N. Y. 529; *Parks* v. *New York,* 111 App. Div. 836, Aff'd 187 N. Y. 555; *Fuhrmann* v. *Coddington Engineering Co.,* 156 Wis. 650. See also, other cases collected in 38 A. L. R. 414; *Corby* v. *Hill,* 4 C. B. N. S. 550, 563; 140 English Reprint 1209, 1212; *Castle* v. *Parker,* 18 L. T. N. S. 367. The cases cited differ, however, from that at bar in that in all of them, the defendant contractor knew or should have known of the presence of the third person on the premises involved and the question of the contractor's negligence or lack of it was affected by that circumstance. In the instant case it appears that the defendant housing authority had not accepted the unit of which 158 Proctor Street was a part and the general contractor was not to deliver occupancy to it until February 11, 1942 and did not know, and under that condition had no reason to anticipate that the premises would be occupied until that date. Under such and other facts here,

the principal contractor was under no duty to see that the apartment was in a reasonably safe condition for occupancy at the time plaintiff was injured. Without actual knowledge of plaintiff's presence in the apartment or some occurrence which would suggest to a reasonably prudent person occupying the position of the general contractor that such might be the case, no duty arose, the violation of which might be negligence on its part.

A different situation is presented as concerns the defendant, Connecticut Light & Power Co. Dealing with the transportation and distribution of a known dangerous agency it was under the duty of exercising a degree of care commensurate with that circumstance. *Nephew* v. *Consumers Power Co.,* 283 Mich. 12, 17; *Johnson* v. *United Fuel Gas Co.,* 112 W. Va. 578, 582; *Groff* v. *Charleston-Dunbar Natural Gas Co.,* 110 W. Va. 54, 59; *Julian* v. *Sinclair Oil & Gas Co.,* 168 Okla. 192, 196; *McWilliams* v. *Kentucky Heating Co.,* 166 Ky. 26, 33, 59 L. R. A. (N. S.) 1224; 12 R C. L. 905, § 46. While performance of its legal duty in this respect obligated it to make a seasonable inspection of its mains and other parts of its distributing system installed by it or under its own control, (*Canfield* v. *West Virginia Central Gas Co.,* 80 W. Va. 731, 733; L. R. A. (N. S.) 1918A 808; *Butcher* v. *Providence Gas Company,* 12 R. I 149, 152, 34 Am. Rep. 626; notes, Ann. Cas. 1916E 279; 25 A. L. R. 267 et seq.; 47 A. L. R. 489; 90 A. L. R. 1082 et seq.; 24 Am. Jur. 683, § 26) such duty does not ordinarily extend to service pipes within a consumer's premises installed by him, and it would not be negligent for failure to do so in the absence of the assumption of such duty by contract or otherwise. *Okmulgee Gas Co.* v. *Kelly,* 105 Okla. 189, 191; *Smith* v. *Pawtucket Gas Co.,* 24 R. I. 292, 96 Am. St. Rep. 713; *Reid* v. *Westchester Lighting Co.,* 236 N. Y. 322, 325, 29 A. L. R. 1247 and note, *Helm* v. *Manufacturers Light & Heat Co.* 86 W. Va. 628, 634, 25 A. L. R. 240; notes, 57 L. R. A. (N. S.) 1024; 25 A. L. R. 272, et seq; 47 A. L. R. 490; 90 A. L. R. 1088; *Swayzee* v. *Augusta,* 113 Kans. 658, 663; *Atlantic Gas Light Co.* v. *Sams,* 29 Ga. App. 446, 451.

But if the company knows at the time it turns on the gas or, after turning on the gas, becomes aware that there are defects in the pipes, it then becomes its duty to make a proper inspection to ascertain the safety of the pipes before it furnishes or continues to furnish gas through them. *Scarborough* v. *Central Arizona Light & Power Co.,* 58 Ariz. 51, 138 A. L. R. 866;

*Barrickman* v. *National Utilities Co.,* (Mo. App.) 191 S. W. 2d 265; *Stephanie* v. *Equitable Gas Co.,* 347 Pa. 110; Milligan v. *Georgia Power Co.* 68 Ga. App. 269; *Southern Indiana Gas Co* v. *Tyner,* 49 Ind. App. 475, 484; *Bell* v. *Brooklyn Union Gas Co.,* 193 App. Div. (N. Y.) 669; *Portsmouth Gas Co.* v. *Maddox,* 44 Ohio App. 288; 90 A. L. R. 1087; *Windish* v. *Peoples Natural Gas Co.,* 248 Pa. 236, 240; Annotations, 138 A. L. R. 883, § 5, 90 A. L. R. 1086, 1088, 47 A. L. R. 489, 490, IV, V 29 A. L. R. 1252, IV and V 25 A. L. R. 270, 272, IV and V. And see *Miller* v. *Gas Service Co.,* 155 Kans. 829, *Swayzee* v. *Augusta,* 113 Kans. 663; *Hebert* v. *Baton Rouge Electric Co.,* 150 La. 957, 961, 25 A. L. R. 245.

The evidence is that the servants and agents of the utility were at the apartment on Friday, February 6, testing out its own gas line (that is from the curb cock in the street to the pet cock in the utility room) and at that time noticed that the drip leg was missing on the customer's service pipe in the subcellar. It was then approaching 4 o'clock in the afternoon. The utility's employees had no drip legs, caps or other appliances with which to correct the condition, nor did any of them report it to their superiors. Instead one of them went to one of the houses across the street where one Long, an employee of the subcontractor was engaged in turning on the utilities there and informed him of the condition. Long replied that his quitting time was 4 p. m., and that he would attach a drip leg if he had time to do so before leaving for the day and if he did not, would do so early Monday morning. The utility employees left soon after 4 o'clock and Long did nothing about the condition that day nor until after plaintiff was found by him in a coma on the following Monday morning. It thus appears that the utility through its servants and agents had actual knowledge of the uncapped pipe referred to on Friday afternoon or more than forty-eight hours before the accident occurred and in ample time to remedy the condition. Under such circumstances, if the situation were the one commonly met with in the cases (that is where a customer's gas line leaks or has an uncapped pipe of which the gas company has notice or actual knowledge and having such notice or knowledge yet turns the gas into it or after learning of the defects, nevertheless, continues the flow of gas through it) there could be little doubt of its negligence. In this case, however, the gas was brought up to the pet cock and the opening in the pipe was between such pet cock and the appliance in the kitchen. The closed pet cock securely sealed the gas and pre-

vented it from flowing beyond it into the section of pipe where the drip leg was missing. The pet cock was opened, not by the utility, but by a third person. In final analysis, the question whether or not the utility was negligent depends upon whether, in the exercise of reasonable care, it should have anticipated that there was a likelihood that such a third person would open the pet cock either by design or accident or through tampering or meddling with it. *Mississippi Public Service Co.* v. *Cunningham*, 189 Miss. 179, 193; *Weinke* v. *Philgas Co.*, 224 Wis., 78, 80; *Loyocano* v. *Louisiana Power & Light Co.*, Louisiana (La. App.) 165 So. 515, 520; *Standard Elkhorn Coal Co.* v. *Davis*, 222 Ky. 773, 776; *Sawyer* v. *Southern California Gas Co.*, 206 Cal. 366, 374, and cases cited on page 375; *Luengene* v. *Consumers Light, Heat & Power Co.*, 86 Kan. 866, 871.

It appears that there were in all about 300 units constructed in the area and that in each of them the utility examined and tested the service pipes from the main in the street to the gas cock in the utility room which was the portion of the line under its control. There is evidence that in the desire to accommodate eligible families with housing facilities as quickly as possible the project manager was given notice a few days ahead of the time when it was estimated that the several apartments in a unit would be ready for occupancy; that the housing manager then notified a number of persons who were seeking places in which to live so that they could inspect the several apartments and rent them at the time they were fit for occupancy; that this practice continued throughout the performance of the work and that the Proctor Street unit was the last of 300 to be completed. It would be quite strange if under all the circumstances the defendant utility did not know that notification to them to inspect their gas lines in a particular unit was an immediate prelude to occupancy by tenants and inevitably signified the presence of persons within such apartments while inspecting them as well as while using them as living quarters.

Aside from this inference, however ,it appears as respects the premises at 158 Proctor Street that here, as well as in the instance of other units, an employee of the utiltiy whose duty it was to inspect and test the gas pipe and connections in question (whether the information was imparted to him by some official of the project or from their own superiors) was notified that the houses were completed and that the pipes were to be tested

in so far as the gas piping was concerned, so that he must have been aware that the apartments in that unit were soon to be occupied. Moreover, he had observed that there was a gas range in the kitchen and water heater in the utility room, the gas appliances being connected and to all appearances everything in the utility room completed, inclusive of a furnace and a coal bin installed near the furnace.

He knew likewise that the project maintenance man did the maintenance for the whole project which inferentially might require turning the gas off or on in the utility room in the house in connection with the actual or approaching tenancy by others. From this and other evidence in the record an inference that the utility should have reasonably foreseen the presence of persons in and about 158 Proctor Street while inspecting the apartments with others prior to renting it and the not unlikely occasion for the maintenance manager to open or adjust the degree of opening of the pet cock in connection with a rental of such apartment, and that if this, as well as any unauthorized tampering or meddling with such pet cock occurred before the drip leg was put in place there would be grave danger of injury or death to persons from explosion or asphyxiation, as well as destruction to property. It is the conclusion that in the exercise of that degree of care commensurate with the dangerous potentialities of illuminating gas, the utility should have foreseen the reasonable likelihood that the pet cock would be opened between Friday and Monday, under the circumstances referred to and that its failure to take measures easily at its disposal to prevent injuries to others in such event was negligence.

The plaintiff's asphyxiation occurred from a series of events in which he had no part. It was the result of negligence on the part of defendant utility and the conduct of the maintenance manager of the housing authority leaving the pet cock sufficiently open for the gas to flow through the customer's line to the point where the aperture caused by the missing drip leg was. The question arises, of course, whether the negligence of the utility was intercepted in its causal effect by the act of the person opening the pet cock so that the latter became the sole proximate cause of plaintiff's injuries or whether it concurred with the negligence of the utility to bring about plaintiff's asphyxiation.

The rule stated in *Sawyer* v. *Southern California Gas Co.,* 206 Cal. 366, 374, and reiterated in *Hilson* v. *Pacific Gas and*

*Electric Co.,* 131 Cal. App. 427, 432, as applicable in this class of cases, is: ". . . that where the original negligence of a defendant is followed by an independent act of a third person which results in a direct injury to a plaintiff, the negligence of such a defendant may, nevertheless, constitute the proximate cause thereof, if, in the ordinary and natural course of events, the defendant should have known the intervening act was likely to happen; but if the intervening act constituting the immediate cause of the injury was one which it was not incumbent upon the defendant to have anticipated as reasonably likely to happen, then, since the chain of causation is broken, he owes no duty to the plaintiff to anticipate such further acts, and the original negligence cannot be said to be the proximate cause of the final injury." Whether the original act be a proximate cause despite the intervention of another upon which the injuries are eventuated is, except in unusual instances, a question of fact. *Sawyer* v. *Southern California Gas Co.,* supra, 375. In the instant case it is found that the admission of gas to the pet cock although prevented from flowing to the customer's line where the opening was, by the closed pet cock, was not, in itself, negligence but became so because the utility should have foreseen in the exercise of a proper degree of care, the likelihood, under all the circumstances, of a third person (particularly the maintenance manager, as actually occurred) opening the pet cock. That condition was a continuing one and existed at the time that the pet cock was left partially opened after the maintenance manager had had it fully opened and thought that he had closed it. Necessarily, the mere opening of the pet cock if there were no gas in the line between it and the main in the street (that is if either the curb cock or governor cock had been closed) would have harmed no one. The presence of the gas up to the pet cock from the source of supply in the street main was an essential element to the accident which was not intercepted by the act of leaving the pet cock partially opened, but a course which activated an otherwise relatively innocent situation into a dangerous one which, however, could not have eventuated without the gas in the pipe. The conclusion is that the escape of gas through the opening where the drip leg should have been placed was the proximate result of the condition referred to and the negligence of the maintenance manager in leaving the pet cock partially open. Both were prerequisites to the accident; there could have been no accident if either was absent. A number of cases involving factual situations very

similar in their material circumstances to those presented here support the conclusion last stated. *McAfee* v. *Travis Gas Corporation,* (Tex.) 153 S. W. 2d 442; *Standard Elkhorn Coal Co.* v. *Davis,* supra; *Sawyer* v. *Southern California Gas Co.* supra, *Hilson* v. *Pacific Gas and Electric Co.* supra; *Merrill* v. *Los Angeles Gas & Electric Co.,* 158 Cal. 499, 504, 505, 139 Am. St. Rep. 134, 31 L. R. A. (N. S.) 559. Other cases have reached a contrary conclusion in view of the circumstances leading up to and surrounding the escape of gas *Mississippi Public Service Co.* v. *Cunningham,* supra; *Loyocano* v. *Louisiana Power & Light Co.,* supra. See, also, *Luengene* v. *Consumers Light, Heat & Power Co.,* supra, and *Chisholm* v. *Atlanta Gas Light Co.,* 57 Ga. 28, 30.

The conclusions reached require judgment against the defendant utility. A considerable volume of testimony was introduced concerning the question whether a very painful and prolonged condition in the lower part of one of plaintiff's legs, and foot, resulting in considerable incapacity and requiring the expenditure of large sums of money in an endeavor to remedy it, was a proximate result of plaintiff's asphyxiation. This could only be resolved by medical opinion of which there was a plentitude. On the basis of this it may not reasonably be found that the same was a sequel causally brought about by the accident. The only elements which may be considered in reaching the damages allowed are the fact of plaintiff's asphyxiation, his incarceration in a hospital for a very brief period and the hospital and other expenses incident to his treatment and recovery, as well, of course, as such pain, suffering and discomfort as he experienced. There is no evidence of any future effects, physical or mental, which arose from his asphyxiation.

Judgment may enter for the defendants, John H. Eisele Company, Incorporated and William L. Harmonay; as between the plaintiff and the defendant, The Connecticut Light & Power Company, judgment may enter in favor of the plaintiff to recover the sum of $3500.