MONROE, C. J.
This is a suit for damages for personal injuries and loss of time and property sustained by plaintiff as the result of a gas explosion which he attributes to the negligence of the defendant. It appears that he was engaged in the fruit, produce, and chicken trade; that he lived at No. 718 Market street, Shreveport, in a house the rear portion of which, by reason of the falling away in that direction of the lot upon which it is built, is elevated some 8 or 10 feet above the surface; and that he kept his stock of chickens in the back yard, and in part under the house; that on the night of September S, 1917, at about half past 10, apprehending rain and fearing that some of the chickens might be drowned, he went out to see about them, and, going under the house, lighted a match, and then a second match, with the result that there was an explosion, followed by a mass of flame, which enveloped him and set fire to the house. He testifies that he heard a noise that sounded to him like that made by water issuing from a pipe, and that he lighted the match in order to enable him to find it. As a matter of fact there was under the house a service pipe with an open end from which gas was issuing, and hence" the explosion and the flame. Plaintiff was badly burned about the face, ears, neck, and arms, and particularly upon his back, no doubt, by reason of the ignition of his shirt and undershirt, and was at once carried to a sanitarium, where he remained under treatment. for 18 days during a great part of which period his suffering was intense, and during the whole of which his condition was, to say the least, miserable, since ,his sores exuded a sticky and malodorous matter, which adhered to the bandages and rendered the frequent dressings that were required excessively painful. The burns on his head, neck, arms, and hands (with the exception, perhaps, of a place on one finger which was deeper) were of the second degree, involving the destruction of the cuticle but not of the derma, but the burn on his back, covering a space somewhat larger, probably, than that which would be covered by three silver dollars, placed in a row, was of the third degree, and there was a smaller burn of that character under one of his arms. There were two trials in the district court, the first, in October following the accident, and the second, in February, 1918, and on both occasions plaintiff complained of loss of strength, insomnia, and nervous irritability, and particularly that the new skin which had replaced the old upon his hands was so tender that he was unable to use those members as he had formerly done. Our conclusion, however, is that if he had not entirely recovered at the *215 time of the last trial, he was in a fair way to do so, and that, as he was then only 29 years of age, he has by this time probably, nothing to remind him of his injuries save the scar on his back, which he can carry without any great inconvenience. For some weeks after his return from the sanitarium, he was unable to attend to his business, and was obliged to employ, feed, and lodge a clerk, and, in addition to the amount awarded on account of his personal injuries, he was allowed something on that account, and also in reimbursement of his .expenses at the sanitarium and of a loss by reason of damage to his household effects.
[1, 2] The negligence charged against defendant is that the service pipe, having been left with an open end under the house occupied by plaintiff and the other end connected with defendant’s main pipe, defendant (through its employes) negligently turned on the gas from the main into the service pipe. The facts in that connection, as we find them, are as follows: The houses Nos. 714, 716, 718 and 720, Market street (to which some witness has applied the term “shacks”) stand in a row, and are rather close together.
As arranged, up to the time of the accident here in question, while a service pipe ’was provided for each of the houses, they did not enter the respective lots directly from the street in front of each, but, indirectly, through lot 718; that is to say, immediately in front of that lot there were, near the curb, in a row, but a few inches apart and buried in upright positions in the ground, with caps flush with the sidewalk on their tops, four oblong cases, or boxes, which, with the cocks that were inclosed within them, served as tollgates between defendant as the manufacturer, and the occupants of the four lots as the consumers', -of gas, which gates were opened or closed and the gas thereby furnished or withheld as the consumers paid their bills or failed so to do.
Wliy the four boxes were all located in front of No. 718 is not explained, but, being so located, the service pipes leading therefrom were carried, first, into that lot, and thence, right and left, into the other lots, respectively, the pipe intended for the service of lot 714, on the one .end, leading from lap. box nearest to that end, and the pipe intended for the service of lot 720 leading from the box nearest to the other end. For some reason, also unexplained, the service pipe leading originally to lot 714'was cut off, under the house on lot 718, leaving an open end, and leaving intact, as we infer, those ends of the pipe, respectively, which were installed upon the premises No. 714, and which connected with the box, or tollgate. Wah Lung, according to his testimony, moved into 714 on the day that plaintiff was burned, and on that day he applied to defendant to bring gas into the house (and his name, in some vague way, suggests the idea that he may have needed it urgently in connection with flat irons, etc., which may account for the fact that defendant undertook, as we think, to install the gas on that day, Labor Day, though it was). He testifies as follows:
“Q. On that day, did you try to get gas- connected to your house, or your store? A. Tes, sir; connect the meter, put in the meter; then open box on the outside the street; then he had no gas — come and take the meter away. After he go away, he no turn back. Q. How many times did the man try to turn on that gas ? A. Two or three times; don’t know; sometime me no home; me go place buy some stuff.”
The learned counsel for defendant say in their brief:
“Mr. J. A. Northcott (who at that time was employed by defendant company in its meter department) admits that, in company with one Mr. Davis, on Saturday September 1, 1911, he went to install a meter for a Chinaman, but, on investigation, by examination of the curb cock, and not by turning in the gas, found that there was no service. His testimony on this point is as follows:
*217 “ ‘Q. Did you and Mr. Davis go to a place on Market street to set a meter for a Chinaman? A. No; I did not go there; he had been there and went to turn the gas on, and I went with him; we did not turn the gas on. Q. Why? A. He stopped the car in front of 716. I did not see the book or anything — in a hurry to get wound up, being Saturday afternoon. I got out of the car, went to 716, thought that is where the meter (was that) he had installed; took the cap off one of the boxes, and he says this gas is turned on; says, “Go to see about 714.” I went, and asked the Chinaman how far the plumber had gone. We looked around, and I then told Davis no use to fool there, no connection had been made. This was blowed up; no use fooling there. Then I remembered that 712, 714, got gas from some place else. It was 714, 716, so I took the meter out, and he went over and phoned the office, and told them no street connection there, and while lie was gone I took the meter out and we left. Q. Did you or he turn on the gas at any time? A. None to turn on. Q. Was either one of those curb cocks there already doing service? A. What do you mean? I could not say — four there; they were there for service all right.’”
It will thus be seen that the testimony which the learned counsel quote in support of the statement that Northcott “admits that, in company with a Mr. Davis, * * * he went to install a meter for a Chinaman,” so far from supporting that statement, flatly contradicts it, since Northcott says that he did not go with Davis to install the meter; that Davis had already been there on that mission, and it is evident that, having failed in an attempt to get the gas into the meter which he had installed, Davis had called Northcott to assist him on that end of the job.
Davis was not called as a witness, and though there is some testimony to the effect that he was not in the state, it fails to convince us that any serious effort was made to obtain his testimony. Taking the testimony of Northcott, as above quoted, and that of the Chinaman, and applying it to certain familiar facts, we find the following to have been the situation as thereby disclosed:
There is no such thing as installing a meter in an empty house where there are no pipes with which to connect it; the man undertaking to do so would not know where to put it. When Davis installed the meter in 714, therefore, he connected it with the pipe which he found there, and which was the pipe that had been severed on its way through lot 718, leaving the open end; and when, as the next thing to be done was to' turn on the gas, he turned on the cock in the box nearest to 714, the gas, instead of going into the meter, went out of the open end of the pipe and under plaintiff’s house; and Davis, after trying the other cocks, or finding them already turned on, called on Northcott, who did not .turn on any of them because he found them already turned on. And he and Davis, leaving them turned on, took away the meter. Of course, all the cocks being turned on, and the meter that had been installed receiving no gas, was conclusive to the effect that neither of them was serving that meter, but the question for an employs then to consider was, where was the gas going that they were letting into the pipe that had been put there to serve a meter in No. 714; and that question Mr. Northcott failed to consider.
The official gas inspector of the city of Shreveport testifies that there is no way of determining whether a pipe intended to serve a particular house is discharging that function save by turning on the proper cock, and thus testing the matter, and we hardly think that Mr. Northcott would care to' be understood as testifying that, by looking at a cock that had not been turned on, he could tell whether, if turned on, it would let the gas into the meter that it was intended to supply. As to the day upon which the occurrences thus referred to happened, we are satisfied that it was on Monday, September 3d, and not Saturday September 1st, but we agree with the judge a quo that it is not a matter of prime importance whether it was the one day or the other. Conceding, arguendo, that as the *219 service pipe between the curb and tbe meter belonged to tbe property owner, defendant should not be held responsible for its being severed without its knowledge. The gas which was turned into that pipe belonged to defendant, and when, through its agent, it was informed that it was not going through the pipe into the meter, it was as much its duty to cut it off until it could find out where it was going as it would be the duty of the keeper of a menagerie, upon learning that a savage animal had not returned to the cage in which he belonged, to find out in what direction he was heading, though in this instance the advantage was with the defendant, since all that was necessary for it to have done in order to have arrested the dangerous agency which it released was to turn a cock that was under its control. Defendant’s counsel argue, at length, against the probability of plaintiff’s having mistaken the sound of escaping gas for that of escaping water, and witnesses were introduced who testified that they had made the experiment for the purposes of this case, and had found that the sounds are really quite dissimilar. And so a person who, seeing two others separately, may think they are near twins, is likely to find, upon seeing them together, that they bear but little resemblance to each other, or who, hearing two automobile horns at different times, thinks they are alike, may find them utterly unlike when heard the one just after the other. Again, in matters of that kind, the impression that one receives is a good deal a matter of suggestion, or preconceived idea; and if one hears a noise under his house and thinks of nothing that could produce it but escaping water, he is apt, without going very deeply into the matter, to assume that it is so produced, though if he were to take time for serious reflection he might readily conclude that it could not be produced by that agency. It is also argued that plaintiff might, and should, have discovered by his sense of smell, before lighting his matches, that he was in the midst of a volume of gas, and testimony was introduced to the effect that the natural gas which is supplied to the people of Shreveport has a perceptible and distinctive odor. In another case against (practically) the same defendant, where an enormous volume of this same gas was allowed to escape into a confined space, resulting in an explosion, a death, and a suit and judgment for damages, it was conceded, and found by this court, that the gas was odorless. It was said in the opinion:
“The gas which the gas company was thus liberating was natural gas, inodorous. It becomes highly combustible * » * when mixed with air. This the gas company knew.” Bradley v. Shreveport Gas, Electric Light & Power Co., 142 La. 52, 76 South. 232.
And the judge a quo says in his opinion herein handed down:
“We think we can take judicial notice of the common fact that the gas in the Caddo gas fields has been considered to have no odor.”
We do not undertake to say that the witnesses have not found the odor to which they testify, but we remain of the opinion that to the ordinary individual who is not especially seeking an odor the gas here in question is ordinarily odorless.
The court a qua gave judgment in favor of plaintiff in the aggregate sum of $5,191, with interest, of which $5,000 was for personal injuries and suffering; $68.50 for expenses at the sanitarium; $97.50 for salary, board, and lodging of a clerk whom plaintiff was obliged to employ for three weeks; and $25 for damage to household effects by the fire. Defendant asks as an alternative to the rejection of the entire demand that the amount of the award be reduced to $1,500; plaintiff, in- answering the appeal, asks that it be increased to $7,691. We, however, find no sufficient reason for complying with either request.
The judgment appealed from is therefore Affirmed.