## LOYOCANO v. LOUISIANA POWER & LIGHT CO.*

### No. 16251.

Court of Appeal of Louisiana. Orleans.

Jan. 27, 1936.

*Rehearing denied 166 So. 150.

516

Deutsch & Kerrigan & Burke, of New Orleans, and J. E. Fleury, of Gretna, for appellant.

Fred A. Middleton and Chas. J. Larkin, Jr., both of New Orleans, for appellee.

JANVIER, Judge.

Jacob Loyocano and his wife, as tenants, occupied an apartment in a building in Gretna, La. In the building were other apartments and commercial establishments.

Louisiana Power & Light Company, a producer and furnisher of gas for domestic and commercial purposes, had installed gas meters through which it furnished gas to the various occupants of the building.

Loyocano and his wife were not users of gas, though defendant company had not removed the meter which had been installed to serve former tenants who had previously occupied the same apartment.

Plaintiff brings this suit against the said company claiming $30,000 for physical injuries, loss of personal effects and furniture, loss of earnings, and for expenses of illness which resulted from an explosion of escaping gas in the apartment and which gas escaped, according to the allegations of Loyocano's petition, because of the negligence of employees of defendant company.

He alleges that on the 5th of December, 1934, he and his wife left the apartment at about 6:30 o'clock p. m. and that on their return at about 10:30 o'clock that night, as they entered the apartment he struck a match for the purpose of lighting an oil heater, and that there was a violent explosion which destroyed his furniture and clothing and severely burned him, partic-

ularly about the face and hands. He makes the following charges of negligence:

(1) That defendant was negligent in not capping the ends of all gas pipes in the premises when it turned off the meter two months before plaintiff moved into the apartment.

(2) That it was negligence to place the meters serving this and other apartments where they were easily accessible to meddlers, trespassers, or children.

(3) That the "disk," which defendant usually inserts in meters when it turns them off on discontinuing service, was not inserted when the meter connected with the apartment in question was cut off two months before plaintiff occupied the apartment.

(4) That it was negligence to fail to inclose such a meter in a box or compartment to protect it against malicious mischief-makers, children, or trespassers.

(5) That it was negligence to fail to inspect the meter when the previous tenants left the apartment.

(6) That defendant should have locked the cut-off valve when the gas service was discontinued before plaintiff's entry into the apartment.

(7) That it is negligence to install several meters in the same place and alongside one another without marking each so that it may be identified with the particular apartment served through it.

Defendant avers that although it had installed the meter and had connected its main gas supply pipe to the said meter and to the other meters serving the other occupants of the building, it had not installed any of the pipes inside of the building and had no control or supervision over those pipes. It particularly avers that when plaintiff and his wife moved into the apartment the two gas outlet pipes were connected to fixtures and that plaintiff had removed these fixtures and had left the two pipes uncapped and open. Defendant denies especially that it was in any way negligent or that any of its employees were in any way at fault in the premises and, in the alternative, it pleads contributory negligence, averring that it was carelessness on the part of plaintiff to remove the gas fixtures which, in this case, it alleges consisted of two small stoves, from the ends of the gas pipes and to leave these gas pipes open.

and uncapped, and it also charges that plaintiff was negligent in lighting the match which ignited the gas, when the odor of the escaped gas should have been noticed by him.

In the Twenty-Fourth judicial district court for the parish of Jefferson there was judgment for plaintiff in the sum of $7,515, of which amount $6,000 was awarded for physical injuries and suffering. From this judgment defendant has appealed.

It appears that plaintiff and his wife had occupied the apartment for about nine months, and they and other witnesses state that during that time they had not used gas. They testify that on the day on which they moved into the premises, plaintiff removed a small gas stove which was attached to one of the gas pipes, and that from that time until the explosion, many months later, both that pipe and the other one remained open and uncapped.

We first direct our attention to the charge that, when the meter was cut off after the former tenant had discontinued the use of gas, the customary small disk was not inserted in the gas supply pipe. This disk is a small round piece of metal about the size and shape of a half dollar, and it is shown that it is the custom of the company, when service through any particular meter is discontinued, to cut off the meter by first closing the valve which is located in the supply line between the main feed pipe and the meter and, in addition to turning off the said valve, to separate the two parts of the union or connection in the supply line immediately adjacent to the meter and to then place this disk in the union and to rejoin the parts of the union and to then place around it a metal collar which is so arranged and closed with a key that the union cannot be opened until the key is broken and the collar removed. This collar is called a "seal."

The employee charged with the duty of cutting off the meter testified that about two months before plaintiff moved into the apartment he (the employee) had turned off the valve and had placed the disk in the union and had then sealed the joint with the customary seal. His assistant testified that though he could not remember the placing of the disk in that particular union, he knew that it was always done and was certain that it had been done on that occasion. The first-mentioned employee was notified immediately after the explosion, and on the next morning he went to the building. He states that he at once noticed that the key to the seal had been slightly broken in such a way that the break was not noticeable to a casual observer. He testifies that with the key so broken it was possible to remove and replace the seal at will. He further states that when he opened the union he immediately discovered that the disk had been removed and that, as a result, there was nothing except the cut-off valve to prevent gas from flowing into the meter and through it into the apartment through the two uncapped pipes.

There can be no doubt that the gas which caused the explosion entered the apartment through these two pipes. Nor is there any doubt that it passed through the meter. Some inference that the explosion resulted from the escape of gas from a fixture in the community bathroom and that this gas seeped through the walls and openings in the apartment of plaintiff is sought to be drawn from certain evidence in the record, but on the night of the explosion the other apartment adjacent to the bathroom was used and, had there been escaping gas in the bathroom in sufficient quantities to force its way into plaintiff's apartment, surely it would have also found its way into the other neighboring apartment.

Furthermore, a reading of that same meter shows that at some time during the period which elapsed between the prior monthly reading of the meter, only about three weeks before the explosion, 1,100 cubic feet of gas' had passed through the meter, although during the eight or nine months just preceding that reading no gas had registered as having gone through the said meter.

From these facts we draw the conclusion already announced that the gas which caused the explosion had passed through the meter. It is conceded that no gas can pass through such a meter so long as the cut-off disk is in place. The inescapable conclusion is that the disk either had not been placed in the union when the meter was cut off many months before, or that the meter had, in the meantime, been tampered with and the disk removed.

Defendant, through one of plaintiff's witnesses, sought to show that it is not a difficult matter to break a seal so that the break will not be noticed by a meter reader and to then uncouple the union and, by

turning the pipe, to make temporary connections around the meter and thus obtain the use of gas without permitting any of it to pass through the meter. In other words, that it is easy to steal gas and to replace the connection before the meter reader makes his regular monthly trip, which trip is shown to have been made on approximately the same day each month. This witness displayed an unwillingness to testify concerning such practice as "meter-jumping," though his testimony, given before he realized the object of the questions, shows that at least he had heard that such things are sometimes done.

Counsel for plaintiff vehemently protests that it would be absurd for plaintiff to have stolen gas and to have permitted it to pass through the meter. But it is not the contention of defendant that plaintiff permitted the stolen gas to pass through the meter; the contention is that the gas was permitted to pass around the meter and that when the meter was reconnected, in anticipation of the visit of the meter reader, the disk was carelessly left out, and that later, when the valve was inadvertently turned on by another person, 1,100 cubic feet of gas passed through the meter and was registered.

As corroborative of the evidence to the effect that the disk was not inserted when the meter was cut off, prior to the time at which plaintiff moved into the apartment, we find most convincing the fact that, according to the records of defendant company itself, 300 cubic feet of gas passed through the meter during the week immediately following the day on which it was cut off and the disk was supposedly inserted. As we have stated, it is conceded that no gas can force its way through such a meter if such a disk is inserted.

It is argued on behalf of defendant that the records from which it appears that the said gas passed through the meter during that first week after it was cut off are erroneous; that the meter reader must have made a mistake. But the error, if it was an error, appears three times in the company's record. Surely it was the duty of some meter reader or of some clerk to notice that from the company's records it appeared that gas was passing through a meter which was supposed to have been entirely cut off.

There is much in the record to which the defendant points as substantiating its theory that plaintiff had been tampering with the meter. In his petition plaintiff avers that the former tenant had removed the gas fixtures and by inference, at least, avers that he did not remove any fixtures nor have anything to do with leaving the pipes uncapped. In his testimony, however, he admits that he did remove one small stove known as a "hot plate" from one of the pipes, and there is much evidence to the effect that he actually removed two small stoves, one from each pipe, and, in fact, according to some of the witnesses, two stoves were found stored in the premises.

But the evident fact that the gas escaped through the meter on two occasions and the further fact that if the plaintiff was "jumping" the meter he need not have removed the disk and, above all, the finding on these points made by our brother below, which is not manifestly erroneous, convinces us that the disk had not been inserted in the meter when it was cut off.

 It is shown by defendant company itself that it had established the custom of inserting these disks whenever it discontinued service to a customer, and it is also shown by the company that if such a disk had been inserted no gas could have passed through the meter. There is evidence tendered by plaintiff to the effect that the cut-off system used by other companies and particularly by the company furnishing gas in the city of New Orleans is superior to that employed by defendant. Defendant denies this and offers much evidence to show that its system is the better. Certainly some such system is necessary and, since the company shows that it did adopt some such safety system as a customary matter, and since we believe that the company did not comply with the requirements of its own system in this particular case, we cannot but conclude that the failure to so comply in this instance constituted negligence on the part of the company's employees.

We have given much thought to the contention that it constitutes negligence to install meters in such an apartment building in such a way as to make it difficult to identify any particular meter as being connected to any particular apartment. We have given much thought also to the argument made that it is negligence to install meters in a place easily accessible to malicious mischief makers or to children. We have also given study to the contention that it is negligence not to lock the valves of such meters. We believe it unnecessary, however, to discuss these var-

ious contentions because we conclude, as we have stated, that it was negligence for the defendant in this instance not to follow the custom which it, itself, had established for the purpose of safeguarding such meters. It may be that without the insertion of such a disk we might have considered it necessary to place each meter in a box and to require that the box be kept locked. It may be that without such a seal and without such a box we may have felt it necessary to identify each meter by the name of the user or by some significant identifying number or initial, but these questions need not be gone into in view of the fact that we reach the conclusion that the seal itself was not inserted and that this negligence renders defendant liable for the consequent damage.

Under all the facts which we find here, it was a very simple thing for a trespasser, a malicious mischief-maker, a child, or some careless person to turn to the "on" position the valve attached to this particular meter with the result that, in the absence of the cut-off disk, gas would flow through the meter and into the apartment of plaintiff. The evidence shows that the valve on such a meter is very easily turned and that a trespasser may turn the gas on without the use of any particular wrench or appliance.

It so happens that in the late evening of the night on which the accident occurred, a user of gas in one of the apartments had sent for a plumber to do certain work on the gas line in that apartment and that the plumber, who arrived after dark, had found it difficult to identify the meter which it was necessary for him to cut off and that he had experimented with several meters in an effort to find the one serving the apartment in which he intended to do the work. This plumber states that he touched only three meters and that no one of them was the meter in question in this case, but the record shows that he did turn off at least one meter in addition to the three he admits he touched, and we feel that there is a grave possibility that he turned on the valve of the meter connected with the plaintiff's apartment. This plumber says that he remained only from 15 to 30 minutes and there is expert testimony which indicates that during so short a time, even if this particular meter had been turned on during the entire time the plumber was working, 1,100 feet of gas could not have passed through it. There is evidence, however, that the plumber remained at work as long as an hour and, furthermore, it appears that the occupant of a neighboring apartment, after the explosion, experimented with the meter to see whether it had been cut off and he found that gas would pass through it and enter the apartment if the valve were turned to the "on" position. In view of the fact that through no other means could the gas have entered the apartment, we conclude that either the plumber remained at work longer than he realized, or that gas passed through the meter faster than the experts believe that it can, or that some of the gas registered passed through while the occupant of the neighboring apartment was experimenting with the meter later.

Many cases are cited in an effort to convince us that it is the duty of a furnisher of gas when installing a meter and commencing service to go into the premises to be served by the meter and to make certain that all pipes are capped. We do not think that those cases are in point even if it be established that there is such a duty because here the company had discontinued service, and we cannot see that there was any duty in it, when cutting off the meter, to go into the premises formerly used and to investigate the condition of the pipes and fixtures.

The question of whether it was contributory negligence on the part of plaintiff to permit the gas pipes to remain uncapped has given us much concern. We have particularly noted that he was aware that the pipes were not capped and that they must have been used as gas pipes prior to the commencement of his term of occupancy of the premises. In fact, he admits that when he first took possession there was a small gas stove attached to one of the pipes and that he disconnected this stove and left the pipe open and uncapped. There is evidence which indicates that there may have been two of these stoves disconnected by him, but in considering the question of contributory negligence on his part it is immaterial whether he removed one or whether there were two of the stoves when he took charge of the premises.

There have been called to our attention many decisions concerning the fixing of responsibility for damages sustained as a result of uncapped gas pipes within the confines of a building, and we conclude that the better rule is that the furnisher of gas is in no way concerned with the

condition of the pipes or appliances inside the premises of a customer, in the absence of knowledge of defects or in the absence of circumstances which might indicate that the pipes are open and that it would be dangerous to turn gas into them. We approve the rule set forth in Ruling Case Law, vol. 12, p. 909, § 49, to the effect that:

"Generally speaking, a gas company which does not install the pipes in a customer's building, and which has no control over them, is in no way responsible for the condition in which they are maintained, and consequently is not liable for injuries caused by a leak therein of which it has no knowledge. One who applies for gas has the duty to see that his own pipes, through which the gas is to be used, are in good order, and no general obligation on the part of the company can be inferred to inspect such pipes."

In volume 28, § 59, page 594, Corpus Juris states the rule as follows:

"The rule has been laid down, * * *, that, in the absence of any fact upon which to base an inference of duty, the failure of a gas company, on introducing gas into a dwelling upon application, to inspect pipes or fixtures which were placed therein by the owner and over which the company has no control, is not negligence."

 From this it follows that it is negligence for an occupant of premises equipped with gas pipes to permit those pipes to remain open and uncapped unless the said occupant is justified in assuming that the gas supply has been absolutely cut-off and that there is no reasonable possibility that the gas may enter the premises through such pipes. There is nothing inherently dangerous about pipes through which gas may at one time have passed. When gas service is discontinued, it is the well-recognized practice to remove the meter and to so cut-off the pipes that there is no possibility whatever of gas entering. Had that been done here, and plaintiff was justified in assuming that it had been done, then no damage could possibly have resulted from the fact that the ends of the pipes within the building were uncapped.

The test of negligence is the standard of care which would be exercised by the ordinarily prudent person. It must be conceded that a very careful person, placed in the position in which Loyocano found himself, would probably have had the pipes capped, but because that would have been done by the very careful person does not make it necessary to hold that Loyocano was guilty of contributory negligence when he failed to do so. He knew that the defendant had been instructed to discontinue the service. He knew that if that had been properly done gas could not get into the pipes. He knew that when he removed the stove no gas entered. He was thus justified in concluding that the service had been cut-off, and if he was justified in assuming that it had been cut-off, he was further justified in assuming that it had been properly cut-off. We doubt that that fictitious individual known in the law as the "ordinarily prudent person" would have done more than he did. We conclude that plaintiff was not negligent in the particulars under discussion. Nor was it negligence to strike a match as he entered the apartment unless it can be shown that there was a sufficient odor to create in his mind a suspicion of escaping gas. There is no evidence to show that there was any noticeable odor and furthermore the evidence shows that he lit the match immediately upon entering the apartment before he had time, in fact, to realize that there was an odor, if, in fact, there was any.

 We believe that the case may be decided upon the principle that a corporation dealing in a dangerous agency, such as gas, must adopt some reasonable method of safeguarding against its escape and, having adopted such method, must follow it. It may be that such a corporation may establish a standard higher than that set by legal requirements or that set by others in the same business. If such an excessive standard is set by the corporation itself, possibly it will be held to be free from negligence if it does not comply with the requirements of that excessively high standard, but does comply with the standards set by a reasonably prudent person or corporation engaged in the same business. But here the standard set by the corporation is not shown to have been unreasonably high. Therefore it should have been followed in this instance. Obviously, there was causal connection between the negligence in failing to insert the disk and the resulting accident. The act of the plumber in carelessly turning on the gas on that meter was such as might have been anticipated under all the circumstances of the case.

 The evidence shows that he sustained loss of personal effects and furniture

and expenses of illness in the sum of $1,515. An attempt is made to show that the amount paid to nurses was not $276, but only $246, but the evidence sustains the higher figure so that the amount awarded on these items, $1,515, appears to us to be correct.

Plaintiff was severely burned about the face, neck, and hands. He was incapacitated for a total period of 127 days. We quote from the testimony of Dr. Mattingly as to the condition of the plaintiff when he examined him:

" * * * He showed evidences of extensive burns, first and second degree of the face and both ears, neck and second and third burns of the hands and fingers. He had * * * scars about both ears, with some distraction of the cartilage on the outer part of the ears. He had a scar on the right side of his face, a discoloration of the face, and the sweat follicles, their operation was interfered with * * *. He had marked distraction of all of the nails of his fingers, which I am certain were all third degree burns. The amount of damage done to the nails was more than second degree burns. * * * His hands have considerable deformity of the nails. They are very much thickened * * *. In addition to that he had a disturbance of circulation, because his hands sweat rather profusely, and they were cold to the touch."

He also made the following statement concerning the permanency of the injuries:

"The condition of the hands is absolutely, without a question, permanent. The sweat goose flesh appearance, I feel certain, is permanent. The discoloration, I feel that perhaps it will remain permanent—that is the pinkish discoloration on his face. I know that all of the scars on his face are permanent."

Concerning the extent of plaintiff's suffering the doctor has the following to say:

"I would say that the suffering was rather extreme, as he had very extensive burns about the body. I don't know of anything other than stones that would give him any more severe pain. It is prolonged, and it is continuous—there is no let-up. It is more a continuous affair."

That the impairment of the use of his hands is not extensive is evidenced by his own statement with reference to them, in which he says:

"They are nervous, that is all—they are very weak."

We also note from the record that when plaintiff entered the courtroom of the district court he voluntarily used his hands in raising the windows. His wife admits that the scars about his face have almost disappeared, her testimony with reference to those scars being as follows:

"Q. There are no marks on your husband's face at the present time, are there? A. There is a little one on the side—a little brown stain. But his hands are all discolored."

In Horrell v. Gulf & Valley Cotton Oil Co., 16 La.App. 91, 133 So. 392, 393, we considered a case in which the plaintiff was severely burned by caustic soda. There we referred to plaintiff and said:

"His face, his eyelids, and his eyes were severely burned as was also from one-fourth to one-third of the entire skin area of his body involving his hands, arms, face, back, buttocks, and thighs."

We allowed $3,000.

In Hahn v. Southwestern Gas Co., 145 La. 212, 214, 82 So. 199, the plaintiff sustained very severe burns concerning which the court said:

"Plaintiff was badly burned about the face, ears, neck, and arms, and particularly upon his back, no doubt, by reason of the ignition of his shirt and undershirt, and was at once carried to a sanitarium, where he remained under treatment for 18 days during a great part of which period his suffering was intense, and during the whole of which his condition was, to say the least, miserable, since his sores exuded a sticky and malodorous matter, which adhered to the bandages and rendered the frequent dressings that were required excessively painful."

The court awarded $5,000 for personal injuries and suffering in addition to the medical expenses, loss of earnings, etc.

A study of those cases and a comparison of the injuries sustained with those which we find here leads to the conclusion that the amount allowed was slightly excessive and we have concluded to reduce the judgment to $5,515.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be and it is amended and reduced to $5,515,

and that as thus amended it be and it is affirmed; appellee to pay cost of appeal.

Amended and affirmed.

HARRY McCALL, Judge ad hoc, participating in absence of Judge RICHARD W. LECHE.